# STATE OF MICHIGAN

# COURT OF APPEALS

DEANNA RAY and All Others Similarly Situated,
a Certified Class,

        Plaintiff-Appellee,

v

CITY OF LANSING,

        Defendant-Appellant.

UNPUBLISHED
April 17, 2018

No. 337058
Ingham Circuit Court
LC No. 13-001242-NZ

Before: O'BRIEN, P.J., and CAVANAGH and STEPHENS, JJ.

PER CURIAM.

Defendant appeals as of right the trial court's opinion and order granting in part and denying in part defendant's motion for summary disposition.[1] We affirm but remand for further proceedings.

On June 12 and 13, 2013, the City of Lansing experienced a severe rainstorm. Heavy rain fell for approximately six hours from 9:00 p.m. on June 12 to 3:00 a.m. on June 13. The storm overwhelmed parts of defendant's sewer system, and sewage, water, and debris flooded the basements of plaintiffs' homes. There was a dispute below regarding the severity of the June 12 and 13 rainstorm. Defendant's meteorologist, Linda Kozura, asserted that the amount of rain varied throughout the Lansing area, and that the area receiving the most significant rainfall experienced a "rainfall frequency of and in excess of a 100 year rain event."[2] In contrast, plaintiffs' meteorologist, Bryan Rappolt, asserted that, based on "the rain event that occurred

---

[1] The trial court granted defendant's motion for summary disposition for class members who either failed to adhere to the notice requirements in MCL 691.1419(1) or who did not live in Lansing. Neither party contests this ruling on appeal.

[2] In the industry, a 100-year storm is one which has a 1% chance of occurring in any given year, a 50-year storm has a 2% chance of occurring in any given year, and a 25-year storm has a 4% chance of occurring in any given year. See *Henry v Dow Chemical Co*, 484 Mich 483, 491 n 7; 722 NW2d 301 (2009).

throughout . . . Lansing," the rainfall for the June 12 and 13 storm constituted less than a 25-year rain event.[3]

On November 8, 2013, plaintiffs filed a class action complaint and jury demand. Plaintiffs set forth a claim solely under MCL 691.1416 *et seq*. Plaintiffs alleged that on June 12 to 13, 2013, defendant's sewer system backed up into plaintiffs' homes, flooding the homes with sewage and water and causing significant property damage. The complaint alleged that defendant's sewer system had a construction, maintenance, design, and/or operation defect that caused the sewer system to backup into plaintiffs' homes. Defendant filed an answer generally denying the allegations and claiming governmental immunity. Plaintiffs subsequently filed a motion for certification as a class action, which the trial court granted.

On May 15, 2015, defendant filed a motion for summary disposition pursuant to MCR 2.116(C)(7) and (C)(10). Relevant to this appeal, defendant argued that plaintiffs' claim failed as a matter of law because plaintiffs failed to establish a question of fact for the elements of MCL 691.1417(3).[4] Specifically, defendant contended that plaintiffs could not establish a genuine issue of material fact (1) that a defect existed in defendant's sanitary sewer system which defendant failed to take reasonable steps to correct, and/or (2) that the defect was a substantial proximate cause of the surcharging/flooding in plaintiffs' basements. Defendant concluded that plaintiffs' failure to create a question of fact for issues under MCL 691.1417(3) entitled defendant to governmental immunity.

In support of its motion, defendant relied heavily on a report prepared by its expert, Steven Kalinowski. Kalinowski, a professional engineer, based his report on Kozura's meteorological report and a number of studies regarding defendant's sewer system. Kalinowski's report concluded that defendant's sewer system was not a substantial proximate cause of plaintiffs' damages. He opined as follows:

---

[3] The significant difference in the experts' estimated storm severity is, to a degree, attributable to the meteorologists' disagreement about how the storm's severity should be calculated. Kourza determined that it was a 100-year rain event by looking at the area of Lansing that received the most rain, whereas Rappolt contended that the storm was less than a 25-year rain event by estimating rainfall throughout the entire city and averaging those estimates. A review of both meteorologists' maps estimating the rainfall throughout the city shows that, although the exact estimates differ, the southwest area of Lansing—where most residents lived—received significantly more rain than the other parts of the city.

[4] The elements of MCL 691.1417(3) are (1) the governmental agency was an appropriate governmental agency, (2) the sewage disposal system had a defect, (3) the governmental agency knew, or in the exercise of reasonable diligence should have known, about the defect, (4) the governmental agency, having the legal authority to do so, failed to take reasonable steps in a reasonable amount of time to repair, correct, or remedy the defect, and (5) The defect was a substantial proximate cause of the event and the property damage or physical injury.

I have concluded that the tremendous and intense rainstorm in numerous areas of the City on June 12-13, 2013 constituted the overwhelming cause of the surcharging of the City's sanitary sewer system and basement flooding that was reported in connection with that storm. The storm produced torrential rain in areas of the City well in excess of the 25 year rainfall frequency standard presently used by the [Michigan Department of Environmental Quality (MDEQ)], and, in substantial areas of south Lansing, in excess of 100 year and 50 year rainfall events. I have concluded that the City's sanitary sewer system was not a substantial proximate cause of the basement flooding reported by residents during or shortly after the June 12-13 storm.

Kalinowski's report included a map that showed the locations of plaintiffs' residents laid over a "detailed storm event rainfall analysis contour map." The purpose of the map was to compare where plaintiffs lived with areas of the city that received the most rain. The report emphasized that "the areas [on the map] with the highest number of claimants match areas receiving rainfall in excess of the 100-year, 50-year, and 25-year storm rainfall."

Kalinowski's report also referenced a model that he ran for defendant's sewer system. According to Kalinowski, the model was based on Koruza's rainfall data and the conditions of defendant's sewers as they existed on June 12 and 13, 2013. Kalinowski claimed that this model showed that the backup of the sewer system was caused by the excessive rainfall, and that there was no defect in defendant's sewer system on June 12 and 13. Kalinowski also opined that defendant's sewer system would have been able to handle the rainfall without surcharging if it were not for "private residential footing drains that [were] improperly connected to the sanitary sewer system on residential properties." Kalinowski stated that he ran a model of the June 12 and 13 storm that confirmed this assertion.

In response to defendant's motion, plaintiffs argued that defendant's motion under MCR 2.116(C)(7) should be denied because governmental immunity for this case was governed solely by MCL 691.1417(2) and did not require plaintiffs to prove their substantive claim in MCL 691.1417(3). Plaintiffs claimed that they satisfied the burden in MCL 691.1417(2) and, therefore, defendant was not entitled to governmental immunity.

Plaintiffs further contended that defendant's motion should be denied under MCR 2.116(C)(10) because plaintiffs had presented a genuine issue of material fact for all the elements in MCL 691.1417(3). Plaintiffs contended that, based on admissions by defendant, it was uncontested that "excessive [inflow and infiltration[5]] entered [defendant's] sanitary sewer and that this caused Plaintiffs' damages." In support of its contention, plaintiffs pointed to Kalinowski's statement that there would have been no backup of the sewer system if the footing drains—which contributed additional inflow during rains—had been disconnected. Plaintiffs also asserted that, based on studies done by defendant, defendant knew of "numerous locations [in its sewer system] where capacity limitations [restricted] the ability to utilize the full available

---

[5] "Inflow" refers to water that enters the sanitary sewer system when it rains, and "infiltration" refers to ground water that enters the sewers.

capacity of" the sewer system "to convey wet weather flow." Plaintiffs referred to these locations as capacity "bottlenecks."[6]

Plaintiffs' expert, Michael Williams, opined that a bottleneck was a defect. Williams identified bottlenecks that "Defendant's own studies and/or documents indicate[d] the presence of," which included "Francis Park Pump Station, Sycamore-Lindberg Interceptor [SLI] and Syphon [sic] 11." Plaintiffs presented some of the studies that their expert relied on. Plaintiffs submitted a 2012 report prepared on behalf of defendant that identified bottlenecks in defendant's sewer system, including the Frances Park Pump Station and Siphon 11. Plaintiffs also presented a 2002 report that recognized that "Siphon No. 11 is a capacity 'bottleneck' in the SLI and southwest interceptor system." Plaintiffs asserted that defendant had known since "at least 1979 that the Frances Park pump station was under capacity," and that defendant had similarly known for over 10 years that the other identified areas were "capacity bottlenecks."

Plaintiffs also presented evidence that, they contended, showed that "Defendant had actual knowledge that on numerous occasions, this lack of capacity caused widespread instances of basement backups." For instance, plaintiffs pointed to the 2012 report, which stated that "[w]idespread basement flooding in HH North and HH South are a direct result of Siphon 11 capacity limitations." Williams opined as follows:

> It is my opinion that the modeling performed on Lansing's sewer system demonstrates that Lansing had actual knowledge that Lansing's sanity sewers could not convey the design storm without surcharging and/or basement backups. . . . It is not disputed that surcharging and basement backups occurred as a result of the storm of June 12-13, 2013. It is also my opinion that based on the report of Mr. Rappolt and Defendant's modeling, that the substantial proximate cause of Plaintiffs' damages was not heavy rain but was the known inability of Defendant's sewer system to convey the design storm.

Williams acknowledged that many plaintiffs lived in areas that had a separated sanitary sewer system which, when combined with infiltration and inflow from sources such as footing drains, caused surcharging. However, Williams believed that this was not the cause of the sewer-system backup. Rather, according to Williams, the bottlenecks, which "are a well known cause of surcharging and basement backups," caused the sewer system to backup into plaintiffs' homes, resulting in plaintiffs' damages.

Plaintiffs further argued that, at the very least, there was a question of fact whether defendant's actions in not addressing the bottlenecks were reasonable. Plaintiffs pointed to

---

[6] A bottleneck occurs when there is a difference in capacity between upstream and downstream areas. When an area downstream has a smaller capacity than the upstream area, it creates a bottleneck and causes water to backflow upstream. In this case, plaintiffs contended that, when the bottlenecks caused the water to backflow, defendant's sewers could not hold the excess water, which caused backups in plaintiffs' basements.

testimony from Williams that, based on the amount of time that defendant was aware of capacity issues with its sewer systems, its failure to correct those issues was not reasonable.

After a hearing on defendant's motion, the trial court eventually issued a written opinion. With respect to defendant's motion for summary disposition under MCR 2.116(C)(7), the trial court found that "MCL 691.1417(2) is the sole regulator of governmental immunity in this matter." The trial court held that, because plaintiffs satisfied the requirements of MCL 691.1417(2), defendant was not entitled to governmental immunity. Accordingly, the trial court denied defendant's motion under MCR 2.116(C)(7).

With respect to defendant's motion under MCR 2.116(C)(10), the trial court found that defendant needed to show that plaintiff failed to establish a genuine issue of material fact for at least one of the elements under MCL 691.1417(3). The trial court held that defendant failed to do so because defendant "relied primarily on discrediting Plaintiffs' expert" in favor of its own expert, which was "a credibility determination regarding expert testimony, a determination that must be made by a jury." Accordingly, the trial court denied defendant's motion under MCR 2.116(C)(10).

On appeal, defendant argues that the trial court erred by denying its motion for summary disposition. We disagree.

"We review de novo a trial court's grant of summary disposition." *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 506; 885 NW2d 861 (2016). Likewise, the availability of governmental immunity presents a question of law that is reviewed de novo. *Norris v Lincoln Park Police Officers*, 292 Mich App 574, 578; 808 NW2d 578 (2011). Although defendant brought its motion for summary disposition under MCR 2.116(C)(7) and (C)(10), defendant only needed to bring its motion under MCR 2.116(C)(7) because plaintiffs' only claim was brought under MCL 691.1416 *et seq*. See *Willett v Charter Twp of Waterford*, 271 Mich App 38, 47; 718 NW2d 386 (2006) ("Although factual development may be necessary, motions brought to defeat claims under MCL 691.1416 through MCL 691.1419 are properly raised under MCR 2.116(C)(7)."). Therefore, we will review defendant's motion for summary disposition only under MCR 2.116(C)(7). As explained by this Court in *Dextrom v Wexford Co*, 287 Mich App 406, 428-429; 789 NW2d 211 (2010),

> MCR 2.116(C)(7) provides that a motion for summary disposition may be raised on the ground that a claim is barred because of immunity granted by law. When reviewing a motion under MCR 2.116(C)(7), this Court must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them. If any affidavits, depositions, admissions, or other documentary evidence are submitted, the court must consider them to determine whether there is a genuine issue of material fact. If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court. However, if a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate. [Footnotes omitted.]

"A question of fact exists when reasonable minds could differ as to the conclusions to be drawn from the evidence." *Id*. at 416.

Under the Governmental Tort Liability Act (GTLA), MCL 691.1401 *et seq*., "governmental agencies are immune from tort liability when engaged in a governmental function." *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143, 156; 615 NW2d 702 (2000). "This grant of immunity is subject to six statutory exceptions." *Wesche v Mecosta Co Rd Comm*, 480 Mich 75, 84; 746 NW2d 847 (2008). At issue in this appeal is "the sewage-disposal-system-event exception, MCL 691.1417(2) and (3)." *Id*. at 84 n 10.

To begin, we note that the trial court erred as a matter of law by concluding that the sewage-disposal-system-event exception to governmental immunity is governed solely by MCL 691.1417(2). MCL 691.1417(2) provides as follows:

> A governmental agency is immune from tort liability for the overflow or backup of a sewage disposal system unless the overflow or backup is a sewage disposal system event and the governmental agency is an appropriate governmental agency. Sections 16 to 19 abrogate common law exceptions, if any, to immunity for the overflow or backup of a sewage disposal system and provide the sole remedy for obtaining any form of relief for damages or physical injuries caused by a sewage disposal system event regardless of the legal theory.

MCL 691.1417(3) states as follows:

> If a claimant, including a claimant seeking noneconomic damages, believes that an event caused property damage or physical injury, the claimant may seek compensation for the property damage or physical injury from a governmental agency if the claimant shows that all of the following existed at the time of the event:
>
> > (a) The governmental agency was an appropriate governmental agency.
> >
> > (b) The sewage disposal system had a defect.
> >
> > (c) The governmental agency knew, or in the exercise of reasonable diligence should have known, about the defect.
> >
> > (d) The governmental agency, having the legal authority to do so, failed to take reasonable steps in a reasonable amount of time to repair, correct, or remedy the defect.
> >
> > (e) The defect was a substantial proximate cause of the event and the property damage or physical injury.

In *Willett*, 271 Mich App at 47, the plaintiff argued that the defendant was not entitled to governmental immunity because the plaintiff had established the elements of MCL 691.1417(2). This Court rejected that argument and held that "MCL 691.1417(3) [imposed] *several* requirements for a claimant to avoid governmental immunity for a sewage disposal system

event," and that the plaintiff must show all of those elements "in order to avoid governmental immunity." *Willet*, 271 Mich App at 49. Since *Willet*, this Court and the Michigan Supreme Court have repeatedly indicated that the sewage-disposal-system-event exception to governmental immunity is governed by MCL 691.1417(2) and (3). See *Linton v Arenac Co Rd Comm*, 273 Mich App 107, 113-114; 729 NW2d 883 (2006); *Hannay v Dep't of Transp*, 497 Mich 45, 60 n 34; 860 NW2d 67 (2014); *Odom v Wayne Co*, 482 Mich 459, 478 n 62; 760 NW2d 217 (2008).

Despite that the trial court did not apply the proper framework for reviewing defendant's motion, we ultimately agree with the trial court's conclusion that questions of fact exist for the elements of MCL 691.1417(3),[7] and, therefore, summary disposition for defendant was precluded.

There is no dispute that defendant is the proper governmental agency. See MCL 691.1417(3)(a). Defendant contends on appeal that plaintiffs failed to identify a "defect" in its sewer system. MCL 691.1417(3)(b). " 'Defect' means a construction, design, maintenance, operation, or repair defect." MCL 691.1416(e). According to defendant, plaintiffs "failed to provide evidence of any particular defect or defects in the City's sewage system." However, defendant admits that plaintiffs identified "bottlenecks" as a defect in defendant's sewer system. And plaintiffs identified numerous bottlenecks in defendant's sewer system, including Siphon 11 and the Frances Park Pump Station. In an affidavit, Williams testified that a bottleneck was a defect.[8] Williams explained that a bottleneck was a defect because it "reduces the system-wide

---

[7] Defendant's appellate brief includes one sentence contending that plaintiffs "failed to submit sworn competent testimony from experts to establish that a 'sewage disposal system event' took place" as required by MCL 691.1417(2). The trial court ruled that plaintiff established the elements of MCL 691.1417(2). Pursuant to MCL 691.1416(k), a " '[s]ewage disposal system event' or 'event' means the overflow or backup of a sewage disposal system onto real property," subject to three exceptions. Defendant does not argue that there was no backup or overflow of a sewage-disposal system onto plaintiffs' property or that one of the three exceptions to the sewage-disposal-system event applied. Defendant's brief does not provide any caselaw to support its position, and does not even reference MCL 691.1416(k). The single sentence referenced above is the only instance where defendant challenges the trial court's ruling with respect to MCL 691.1417(2). Therefore, this issue is deemed abandoned, and we do not address it further. See *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999).

[8] Plaintiffs' briefs at trial and on appeal are somewhat unclear regarding what constituted the alleged "defect." The only "defect" explicitly identified by plaintiffs or Williams was the bottlenecks in defendant's sewer system. However, plaintiffs appear to contend that the excess inflow and infiltration of defendant's sewer system was also a defect. If this is plaintiffs' argument, we would hold that plaintiffs failed to establish that the inflow and infiltration satisfied MCL 691.1417(3)(b) because the identified "defect" must be part of the "sewage disposal system." Pursuant to MCL 691.1416(k),

"Sewage disposal system" means all interceptor sewers, storm sewers, sanitary sewers, combined sanitary and storm sewers, sewage treatment plants, and all

-7-

storage in that excess sewage cannot pass through the bottleneck into an area where there may be extra storage in the collection system."

In support of their assertion that a bottleneck was a defect, plaintiffs provided a report prepared for defendant from 2012 that recommended a "balanced system approach" to help improve the city's sewer system. The 2012 report provided as follows:

> The balanced system approach attempts to maximize the peak wet weather flow to the [Waste Water Treatment Plant (WWTP)]. . . . The investigation to eliminate bottlenecks in the wastewater collection system identified several capacity restrictions. These restrictions result from inadequate pump station or siphon capacity while the existing upstream and downstream trunk sewers have adequate capacity. Removing these bottlenecks will increase the flows to the WWTP.

Plaintiffs argued that the "balanced system approach" identified by defendant as a way to utilize the existing sewer capacity demonstrates that bottlenecks prevent the sewer system from operating as it was designed, thereby demonstrating a defect. In response, defendant points to Kalinowksi's testimony that the sewer system can still operate as intended in spite of the bottlenecks. While Kalinowski's testimony supports defendant's position, reasonable minds could differ as to whether the evidence demonstrated that the bottlenecks were a defect. See *Dextrom*, 287 Mich App at 416.

Defendant does not contest that it knew or should have known about the bottlenecks. MCL 691.1417(3)(c). Even if it did contest this element, there is evidence that defendant published studies discussing the bottlenecks and their effect of limiting the sewer system's capacity. At the very least, plaintiffs have established a question of fact whether defendant knew of the capacity bottlenecks in its sewer system. See *Dextrom*, 287 Mich App at 416.

---

other plants, works, instrumentalities, and properties used or useful in connection with the collection, treatment, and disposal of sewage and industrial wastes, and includes a storm water drain system under the jurisdiction and control of a governmental agency.

Unrebutted deposition testimony established that only a homeowner could remove a footing drain connected to the sewer system. Therefore, footing drains could not be considered a defect to the "sewage disposal system" because they were not "under the jurisdiction and control of a governmental agency." Plaintiffs make no effort to distinguish inflow added to the sewer system by footing drains from other sources of inflow and infiltration. Accordingly, plaintiffs' attempt to broadly define inflow and infiltration as a "defect" would fail. Moreover, even were we to accept that inflow and infiltration—not including inflow from footing drains—constituted a defect, we would conclude that plaintiffs failed to present *any* evidence to establish a question of fact whether the other sources of inflow and infiltration were a substantial proximate cause of the sewer-system backup. See MCL 691.1417(3)(e).

Defendant briefly contends that it took reasonable steps in a reasonable amount of time to remedy the defects. MCL 691.1417(3)(d). In 2004, defendant entered into an Administrative Consent Order (ACO) with the MDEQ in which defendant agreed that its sewer system would "operate during a 25-year, 24-hour storm . . . without causing basement backups" by December 31, 2020. Kalinowski opined that defendant had "been proactively" developing a plan to meet this standard in a "fiscally responsible" way. Kalinowski asserted that defendant's plan was "developed in accordance with [the Environmental Protection Agency's] Capacity Management Operation and Maintenance (CMOM) Program guidelines[.]" Defendant argues that, based on the steps it has and is taking to comply with the ACO, there is no question of fact that it is taking reasonable steps in a reasonable amount of time to repair or remedy the bottlenecks.

However, plaintiffs presented evidence that defendant was aware of the bottlenecks before the 2004 ACO. A 1979 report prepared for defendant indicated that Frances Park Pump Station was under capacity and that it would cost $2,800,000 to correct the problem. A 2003 report indicated a number of pump stations that were "under capacity," including Frances Park Pump Station. A different study by defendant issued in 2003 identified Siphon 11 as a "capacity 'bottleneck' " that would "likely require relief capacity in order for" other parts of the sewer system "to function as designed." Williams opined that "it was not reasonable for the City of Lansing to wait 36 years to address the known capacity limitations at the Frances Park Pump Station when the cost to fix this known bottleneck was $2,800,000." Williams also opined that it was not reasonable for defendant to fail "to address the known problems with [S]iphon 11" because, based on defendant's own documents, defendant was aware of its capacity issues since at least 2003.

Following the June 12 and 13, 2013 storm, defendant stated in a presentation to residents that one solution to stopping basement backups was to eliminate capacity bottlenecks in the system, and it identified the "Low Hanging Fruit" as "Siphon 11 Capacity Upgrade" and "Frances Park Pump Station Capacity Upgrade." Despite the fact that these capacity upgrades were "low hanging fruit," defendant failed to address the issue nine years after it entered into the ACO.

In sum, despite defendant's efforts to comply with the 2004 ACO, plaintiffs presented evidence that defendant knew of capacity bottlenecks in its sewer system before the 2004 ACO, and reasonable minds could differ whether it was reasonable for defendant to wait until it entered into the ACO before it began addressing the known bottlenecks. Plaintiffs also presented sufficient evidence to establish a question of fact whether defendant's actions since entering the ACO, specifically its failure to address the "low hanging fruit" nine years after the ACO, were reasonable. See *Dextrom*, 287 Mich App at 416.

Lastly, defendant contends that plaintiffs failed to establish a question of fact whether the bottlenecks were "a substantial proximate cause of the event and the property damage." MCL 691.1417(e). " 'Substantial proximate cause' means a proximate cause that was 50% or more of the cause of the event and the property damage or physical injury." MCL 691.1416(l). "The event" refers to "the overflow or backup of a sewage disposal system onto real property." MCL 691.1416(j).

To establish this element, plaintiffs submitted a 2012 study that was prepared on behalf of defendant stating that "[w]ide spread basement flooding in HH North and HH South are a direct result of Siphon 11 capacity limitations." Plaintiffs also provided reports showing the difference in capacities between the areas upstream and downstream of the bottlenecks. For instance, the 2012 report provided that "[t]he current capacity of Siphon 11 is 33 million gallons per day (MGD) and the upstream and downstream sewer capacities are approximately 44 MGD." Another report prepared for defendant in 2002 likewise indicated that "Siphon No. 11 has a lower capacity than the interceptors immediately up and downstream of the siphon." The report went on to state that "[s]everal rainfall events produced surcharge upstream of the siphon," which was recorded in areas where many plaintiffs lived. Other reports provided a comparison between the bottlenecks' capacities and the peak flow rates from a 25-year rain event. The report estimated that the capacity of the Frances Park Pump Station was 12.7 MGD, while its peak flow rate for a 25-year rain event was 29.9 MGD. Plaintiffs also provided a table of the flow rates for Siphon 11 indicating that the capacity flowrates both upstream and downstream of the siphon were greater than the siphon's nominal capacity. Williams stated the following in an affidavit:

> I have reviewed Defendant's documents which indicate that the presence of the bottlenecks reduces the ability of the Defendant's sewer system to store excess sewage. Specifically, on June 12-13, 2013, there were areas downstream of the various bottlenecks where the rainfall was limited. It is my opinion that without the presence of the bottlenecks, the sewer systems located in the area that had very little rain could have provided excess capacity that would have limited, if not entirely eliminated the surcharging and basement backups that occurred on June 12-13, 2013.

Based on the evidence submitted by plaintiffs, reasonable minds could differ whether the capacity bottlenecks were a substantial proximate cause of the backup of defendant's sewer system into plaintiffs' basements and subsequent damage to plaintiffs' property on June 12 and 13, 2013.

Defendant argues that this Court should reject plaintiffs' argument because Williams failed "to offer calculations, studies or modeling of the June 12-13, 2013 storm." However, defendant cited no law or court rule requiring plaintiffs to submit calculations, studies, or modeling to establish causation. As the evidence discussed demonstrates, plaintiffs have submitted ample evidence for reasonable minds to differ whether the capacity bottlenecks were a substantial proximate cause of the backup of defendant's sewer system into plaintiffs' basements on June 12 and 13, 2013, and the resulting damages. See *Skinner v Square D Co*, 445 Mich 153, 164; 516 NW2d 475 (1994) (explaining that circumstantial evidence indicating a logical sequence of cause and effect can be sufficient to create a reasonable inference of causation).

Defendant also argues that this Court should reject plaintiffs' argument because Williams's analysis did not "exclude other reasonable causes." In support of its argument, defendant relies on *Fingerle v City of Ann Arbor*, 498 Mich 910 (2015), in which our Supreme Court vacated the majority's opinion in *Fingerle v City of Ann Arbor*, 308 Mich App 318; 863 NW2d 698 (2014), and adopted the concurring opinion of Judge O'Connell. In *Fingerle*, the plaintiff's home was in an area that was historically prone to flooding, and, in the early 1990s,

the defendant built a relief storm sewer to help service the area. *Id*. at 321 (opinion by SAAD, J.). While this infrastructure reduced the amount of flooding, flooding still occurred. *Id*. In 2002, the plaintiff built a large egress window directly across from a private retention basin that had overflowed in past rain events. *Id*. Following an intense rainstorm in 2010, rainwater entered the plaintiff's home through the egress window. *Id*. The plaintiff argued that this flooding occurred because the relief storm sewer was defective; namely, the sewer was too small and the defendant should have built a bigger one. *Id*. at 340 (O'CONNELL, J., concurring). Judge O'Connell held that the plaintiff's claim failed because the plaintiff failed to establish "that the alleged defects were a substantial proximate cause of the overflow and of the rainwater in the plaintiff's basement." *Id*.

Contrary to defendant's contention in this case, Judge O'Connell's holding in *Fingerle* was not that the plaintiff failed to establish that the alleged defect was a substantial proximate cause because the plaintiff's expert failed to address other possible causes. Rather, Judge O'Connell held that the plaintiff failed to establish that the defect was a substantial proximate cause because the plaintiff "provided no evidence to establish that the relief storm sewer exacerbated the flooding, or, for that matter, that the relief storm sewer failed to divert water," and the plaintiff's "evidence [established], at best, that on the night of the intense rainstorm, the relief storm sewer did not divert enough rainwater to prevent water from entering plaintiff's basement egress window." *Id*. In other words, the plaintiff failed to establish that the relief storm sewer was the cause in fact of the plaintiff's injury,[9] and "[i]f factual causation cannot be established, then proximate cause, that is, legal causation, is no longer a relevant issue." *Ray v Swager*, 501 Mich 52, 64; 903 NW2d 366 (2017).

In this context, *Fingerle* addressed the fact that the plaintiff's expert failed to create a question of fact regarding whether the relief storm sewer, in fact, caused the plaintiff's damages. Judge O'Connell explained as follows:

> Nothing in plaintiff's expert's report assesses the effect of the relief storm sewer on the degree of basement flooding that had historically occurred or that would have occurred without the relief storm sewer. Nor does plaintiff's expert assess the effect of plaintiff's decision to add a basement egress window in an area prone to flooding. Instead, plaintiff's expert addressed solely the alleged defects in the relief storm sewer. [*Fingerle*, 308 Mich App at 341.]

Therefore, contrary to defendant's assertion, *Fingerle* did not require plaintiffs' expert "to exclude other reasonable causes."[10] Instead, to survive summary disposition, plaintiffs needed to

---

[9] As explained by our Supreme Court, "a court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries." *Craig v Oakwood Hosp*, 471 Mich 67, 87; 684 NW2d 296 (2004).

[10] We find further support for our conclusion in the text of the statute. "It is not uncommon that more than one proximate cause contributes to an injury." *Ray*, 501 Mich at 65. MCL 691.1417(3)(e) provides that the defect must be a "a substantial proximate cause" of the backup

establish a question of fact whether the bottlenecks were a substantial proximate cause of the backup or overflow of defendant's sewer system and plaintiffs' damages, which, as explained, plaintiffs did. See MCL 691.1417(3)(e); *Dextrom*, 287 Mich App at 416.

Defendant insists that "[u]nder any analysis, the June 12 and 13, 2013 storm was [a] substantial proximate cause" as demonstrated by its experts' analyses. The Michigan Supreme Court recently discussed the meaning of proximate cause in cases involving the GTLA. In *Ray*, 501 Mich at 71-72, our Supreme Court stated as follows:

> Determining proximate cause under the GTLA, or elsewhere, does not entail the weighing of factual causes but instead assesses the legal responsibility of the actors involved. Moreover, because proximate cause is concerned with the foreseeability of consequences, only a human actor's breach of a duty can be a proximate cause. Consequently, nonhuman and natural forces, such as a fire, cannot be considered "the proximate cause" of a plaintiff's injuries for the purposes of the GTLA. Instead, these forces bear on the question of foreseeability, in that they may constitute superseding causes that relieve the actor of liability if the intervening force was not reasonably foreseeable.

We find this language instructive and reject defendant's argument that the severe storm could have been a substantial proximate cause of the backup of defendant's sewer system and the resulting damages. Rather, the severity of the storm may constitute a superseding cause that relieves defendant of liability if it was not reasonably foreseeable. See *id*. at 72. The parties' meteorologists contest the severity of the storm, and we conclude that a question of fact remains regarding the severity of the storm and whether it was a superseding cause of the backup of defendant's sewer system into plaintiffs' basements.

Accordingly, plaintiffs presented sufficient evidence upon which reasonable minds could differ as to whether the bottlenecks were a substantial proximate cause of the backup of defendant's sewer system and plaintiffs' damages. See *Dextrom*, 287 Mich App at 416. Because plaintiffs established a question of fact with regard to each element of MCL 691.1417(3), the trial court properly precluded summary disposition in favor of defendant.

---

of the sewer system and damages, and MCL 691.1416(l) defines a substantial proximate cause as a "a proximate cause that was *50% or more of the cause* of the event and the property damage or physical injury." (Emphasis added). MCL 691.1416(l) does not state that a substantial proximate cause must be "more than 50%" of the cause, meaning that two proximate causes that were each 50% the cause of the sewer-system backup and damages would *both* be a substantial proximate cause under MCL 691.1417(3)(e). This is further supported by MCL 691.1417(3)(e)'s use of "*a* substantial proximate cause" instead of "*the* substantial proximate cause." See *Robinson v City of Detroit*, 462 Mich 439, 460; 613 NW2d 307 (2000) (noting that "it is particularly indefensible" for a court "to read 'the proximate cause' as if it said 'a proximate cause'" given the Legislature's history of differentiating the two). Although the statute requires a plaintiff to establish that the defect was at least 50% of the cause, it does not require a plaintiff to exclude *all* other reasonable causes.

However, the trial court ordered that the remaining factual issues were questions for a jury. Although MCL 691.1417(3) "clearly provides [plaintiffs'] a potential cause of action," *Bosanic v Motz Dev, Inc*, 277 Mich App 277, 283; 745 NW2d 513 (2007), the sewage-disposal-system-event exception to governmental immunity is governed by MCL 691.1417(2) and (3), see *Willet*, 271 Mich App at 49. Therefore, the remaining factual issues to be resolved in this case deal with an exception to governmental immunity under MCR 2.116(C)(7). As this Court explained in *Dextrom*, 287 Mich App at 430, "[a] *trial* is not the proper remedial avenue to take in resolving the factual questions under MCR 2.116(C)(7) dealing with governmental immunity." Instead, because the sewage-disposal-system-event exception to governmental immunity remains a question of law for the court, a remand for an evidentiary hearing is appropriate. See *id*. at 432.

Accordingly, we instruct the trial court to hold an evidentiary hearing for the purpose of obtaining such factual development as is necessary to determine whether defendant is subject to the sewage-disposal-system-event exception to governmental immunity in MCL 691.1417(2) and (3). See *id*. at 432. On the basis of the further factual development presented at that hearing, if the trial court determines that defendant is subject to the sewage-disposal-system-event exception to governmental immunity as a matter of law, then it should deny defendant's motion for summary disposition under MCR 2.116(C)(7). See *id*. at 432-433. However, if the trial court determines that defendant is not subject to the sewage-disposal-system-event exception to governmental immunity as a matter of law, then the trial court should grant defendant's summary disposition motion under MCR 2.116(C)(7). See *id* at 433.

We affirm but remand for further proceedings consistent with this opinion. No taxable costs pursuant to MCR 7.219, neither party having prevailed in full. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Mark J. Cavanagh
/s/ Cynthia Diane Stephens